## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| LEANN BROWN, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO 04-0506-L |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
|     Defendant. | ) | |

## ORDER

Plaintiff brings this action under 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for Social Security disability insurance benefits and supplemental security income.  The parties waived their right to proceed before a United States District Judge and consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in connection with this action. (Doc. 17).  This action was referred to the undersigned by Senior United States District Judge Charles R. Butler, Jr., to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Doc. 18).  Oral argument was held on April 29, 2005.  Upon consideration of the administrative record, oral argument and the memoranda of the parties, the decision of the Commissioner is **affirmed.**

I.    <u>**Issues on Appeal**</u>

    1. Whether the Administrative Law Judge (ALJ) erred by failing to give proper weight to the opinions of plaintiff's treating physicians, Dr. Brockington and Dr. Crompton, and the examining psychologist, Dr. Goff.

2. Whether the ALJ improperly assessed plaintiff's subjective complaints of pain and other symptoms.

3.  Whether the ALJ erred by failing to formulate a hypothetical question to the vocational expert which included all of plaintiff's impairments.

4.  Whether the ALJ erred by relying upon the opinion of an unacceptable medical source.[1]

## II.     Background Facts

Plaintiff was born October 20, 1962 and was forty years old at the time of the administrative hearing on February 19, 2003. (Tr. 40).  Plaintiff graduated from high school and attended college for one year.  She also completed Emergency Medical Technician training. (Tr. 126).  She has past relevant work in the textile industry as a compactor operator, quilt sewing machine operator, knitter, cutter, serger, and button sewing.  She also has past relevant work as a  furniture sander and toy store clerk-cashier. (Tr. 110-117 ).  Plaintiff alleges that she became unable to work on December 7, 2000 because of injuries received in a motor vehicle accident. (Tr. 120, 137-195).

## III.    Procedural History

Plaintiff applied for disability insurance benefits and supplemental security income on June 18, 2001 with a protective filing date of May 25, 2001. (Tr. 73, 74-76 ).  The applications were denied initially. (Tr. 61-62, 63-69).[2]  On February 19, 2003, an administrative hearing was held before the

---

[1] Plaintiff's issues have been re-characterized from those listed in her statement of issues.  One issue has been eliminated.  Plaintiff listed the issue of whether the ALJ erred by improperly substituting his own judgment for that of a medical expert.  However, the record does not indicate that medical expert testimony was obtained by the ALJ. (Tr. 29-60).

[2] The reconsideration stage was eliminated from this case pursuant to a test of modifications to the disability determination. 20 C.F.R. §§ 404.906, 404.966, 416.1406 and 416.1466.

ALJ and plaintiff, her attorney and a vocational expert (VE) were present. (Tr. 29-60). On July 25,

2003, the ALJ entered a decision wherein he found the plaintiff not disabled. (Tr.11-25). On July 7,

2004, the Appeals Council denied the request for review and the hearing decision became the final

decision of the Commissioner of Social Security. (Tr. 5-7).

**IV**.   **Findings of the Administrative Law Judge**

The ALJ found plaintiff has the severe impairments of tendinosis of the right shoulder, traumatic

calcification of the right hip, thyroiditis, carpal tunnel syndrome, and an adjustment disorder. (Tr. 19).

The ALJ found that these impairments singly or in combination did not meet or medically equal a listing

in the Listing of Impairments. 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 19). The ALJ found plaintiff's

allegations regarding her inability to work were "minimally credible," and that plaintiff would experience

"less than moderately severe" pain. (Tr. 20, 22).

The ALJ found plaintiff has the residual functional capacity for light or less exertional work. (Tr.

22). He also determined plaintiff can

> perform no overhead work; no frequent pushing and pulling with her right upper
> extremity; needs a sit/stand option at the work site; no use of foot controls; would need
> bench type work if available where she would not have to do any frequent postural
> activities like crouching, squatting, and kneeling; and she would be restricted to
> ambulating independently two to three miles per hour at a 5% grade for ten minutes and
> able to lift 25 pounds overhead.

(Tr. 22).

The ALJ also found plaintiff's impairments result in a mild restriction of her daily activities,

moderate difficulties in maintaining social functioning, moderate deficiencies of concentration,

persistence or pace, but would never result in episodes of decompensation or deterioration. (Tr. 21).

3

The ALJ found plaintiff would

> have moderate or less restrictions in all areas as to her ability to cope with the mental
> demands of the workplace, has never had an episode of decompensation of extended
> duration due to a mental impairment, has a verbal IQ of 94, performance IQ of 95, and
> a full scale IQ of 92, and has the ability to remember simple instructions[.]

(Tr. 22).

The ALJ determined that plaintiff could not return to her past relevant work. (Tr. 22).  Based

upon the testimony of the vocational expert, the ALJ found she could perform other work which exists

in significant number in the national economy and was not disabled. (Tr. 23-24).

**V**.     **Plaintiff's Testimony**

At the hearing on February 19, 2003, plaintiff testified as follows:

Plaintiff has not worked since the automobile accident in December 2000. (Tr. 30).  She cannot

work because of pain, dizziness, poor memory and weakness on her right side. (Tr. 38, 51).  She is

separated from her husband.  She and her three younger children live with her nineteen year old

daughter. (Tr. 40, 44).  She has custody of her children but has not tried to get child support from her

estranged husband. (Tr. 41).  Plaintiff has a valid driver's license. (Tr. 41).  She is six feet three and

one-half inches tall and weighs 235 pounds.  Her normal weight was about 170 but she gained weight

because of her thyroid. (Tr. 40).  Her left leg is one inch longer than her right because of a childhood

bone infection in her left hip. (Tr. 38-39).  Plaintiff smokes a half pack of cigarettes per day but does

not drink. (Tr. 48).

Plaintiff testified that she received a fractured pelvis, fractured ribs, and liver and kidney

damage in the accident. (Tr. 34).  She received physical therapy for her right side, balance, and fatigue.

She still has problems with balance and dizziness. (Tr. 34, 38).  She can perform housecleaning activities for about fifteen minutes before having to stop. (Tr. 35).  She also has pain, stiffness, and soreness in her right hip, right ribs and right shoulder and slowness and reduced grip strength in her right hand. (Tr. 36-37).  The right side of her body is weaker than the left. (Tr. 37).  She can pick up ten pounds with her right hand. (Tr. 59).  She used a walker for a few months after the accident.  When she stopped, she had to move slowly because her balance was off. (Tr. 44).  Plaintiff was in a second automobile accident in August of 2002 and injured her sternum.  She was treated at the emergency room and released the same day. (Tr. 51).  Recently, she lost her balance and fell off a porch.  She was treated at the emergency room and released the same day. (Tr. 50).

Plaintiff testified that her injuries cause constant pain which is worse in certain weather. She takes no pain medication but for Neurontin for headaches. (Tr. 47).  She has been treated for recurrent, severe headaches since June 2002 which are caused by a pinched nerve. (Tr. 35, 53).  The Neurontin does not work as well as it did but she has not yet told her doctor. (Tr. 47-48).  She rated her pain as nine and one-half on a scale of one to ten with one representing no pain and ten representing pain which would require emergency treatment. (Tr. 48).  Pain at this level does not occur every day. The pain occurs in her chest and she has pain on sneezing but she has not yet told her doctor. (Tr. 48). She does not see her doctor more frequently because he said he could do nothing more and her pain will have to be managed. (Tr. 53-54).  Plaintiff's thyroid was removed in June 2002 and she now takes medication. (Tr. 35).  She has been doing okay. (Tr. 42-43).  She also takes Zoloft for mood swings. (Tr. 49).

Plaintiff is independent in her personal hygiene and eats regular meals. (Tr. 45).  Each day she

gets up around six o'clock and gets her children up and off to school.  She goes to bed around nine

o'clock or ten o'clock. (Tr. 45, 46).  Plaintiff can do a little bit of housework but can not sweep, mop,

or make beds.  She can cook and grocery shop with some help.  She does not attend church and has

few friends but gets along okay with her family. (Tr. 46).

**VI**.   **Vocational Expert Testimony**

The Vocational Expert (VE) testified that plaintiff's past relevant work as a material cutter,

compacting machine operator, knitting machine operator, and furniture sander were  medium, unskilled

work.  The VE testified that plaintiff's past relevant work as a sewing machine operator was light,

unskilled work. (Tr. 30-31).

The ALJ presented a hypothetical question based upon a person of plaintiff's age, education

and past work experience who was limited to light or sedentary exertional work and had less than

moderately severe pain, moderate or less restrictions in all mental basic work activities but without any

episodes of decompensation, an IQ of 94, 95 and 92, the ability to follow simple instructions, and an

average memory index. (Tr. 55-56).  The ALJ added the elements of no overhead work, no frequent

pushing and pulling with the right upper extremity, a sit/stand option, no foot controls, bench type work

without frequent crouching, squatting and kneeling. (Tr. 56).  The VE responded that the person could

not perform any of her past relevant work but could perform the light, unskilled work such as ticket

taker and order clerk.  (Tr. 56).

The ALJ then presented a second hypothetical question wherein he substituted the mental

restrictions identified by Dr. John Goff.  The VE responded that no work would be available for a

person with marked to extreme impairments in the ability to follow simple instructions or maintain

appropriate attention and concentration as noted by Dr. Goff. (Tr. 56-57).

Plaintiff's counsel added the elements of slow motor speed, weak grip strength and impaired dexterity of the right hand.  The VE responded that the quantity of jobs identified in response to the first hypothetical would be significantly reduced but not precluded.  Plaintiff's counsel then questioned the VE as to whether Dr. Goff's finding of moderately severe cognitive deficits would have vocational implications.  The VE responded that it would according to how moderately severe cognitive deficits affected other areas of the mental residual functional capacity assessment. (Tr. 57-58).

The ALJ then presented a third hypothetical question based upon a physical therapist's assessment in the records of Dr. John Crompton which included the elements of ambulating independently, walking 2.3 miles per hour at a five-percent grade for ten minutes and the ability to lift twenty-five pounds overhead. (Tr. 58, 195).  The VE responded that based upon those restrictions only, the positions identified in response to the first hypothetical would still be available as well as the previous employment as a sewing machine operator. (Tr. 58-59).  The ALJ amended the hypothetical to restrict the lifting to ten pounds and the VE responded that the unskilled positions would still be available. (Tr. 59).

## VII.  <u>Analysis</u>

### A.  <u>Standard of Review.</u>

In reviewing claims brought under the Act, this court's role is a limited one.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence.  <u>Brown v. Sullivan</u>, 921 F.2d 1233, 1235 (11th

Cir. 1991) (citing <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11ᵗʰ Cir. 1983)).  Substantial

evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such

relevant evidence as a reasonable person would accept as adequate to support a conclusion."

<u>Richardson v. Perales</u>, 402 U.S. 389, 390, 401, 91 S.Ct. 1420, 1427 (1971);  <u>Bloodsworth</u>, 703 F.

2d at 1239.  The Commissioner's decision must be affirmed if it is supported by substantial evidence

even when a court finds that the preponderance of the evidence is against the decision of the

Commissioner. <u>Richardson</u>, 402 U.S. at 401, 91 S.Ct. at 1427 (1971); <u>Bloodsworth</u>, 703 F.2d at

1239.  "In determining whether substantial evidence exists, we must view the record as a whole, taking

into account evidence favorable as well as unfavorable to the [Commissioner's] decision." <u>Chester v.</u>

<u>Bowen</u>, 792 F.2d 129, 131 (11ᵗʰ Cir. 1986).  Further, it has been held that the Commissioner's "failure

to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that

the proper legal analysis has been conducted mandates reversal." <u>Cornelius v. Sullivan</u>, 936 F.2d 1143,

1145-46 (11ᵗʰ Cir.1991).  This court's review of the Commissioner's application of legal principles is

plenary.  <u>Walker v. Bowen</u>, 826 F.2d 996, 999 (11ᵗʰ Cir. 1987).

### B.    <u>Statement of the Law</u>

An individual who applies for Social Security disability benefits or supplemental security income

must prove their disability.  <u>See</u> 20 C.F.R. § 404.1512; 20 C.F.R. § 416.912.  Disability is defined as

the "inability to do any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than twelve months."   42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §

404.1505(a); 20 C.F.R. § 416.905(a).   The Social Security regulations provide a five-step sequential

evaluation process for determining if a claimant has proven their disability.  See 20 C.F.R. § 404.1520;

20 C.F.R. § 416.920.  At the first step, the claimant must prove that he or she has not engaged in

substantial gainful activity.  At the second step, the claimant must prove that he or she has a severe

impairment or combination of impairments. If, at the third step, the claimant proves that the impairment

or combination of impairments meets or equals a listed impairment, then the claimant is automatically

found disabled regardless of age, education, or work experience.  If the claimant cannot prevail at the

third step, he or she must proceed to the fourth step where the claimant must prove inability to perform

their past relevant work.  Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986).  In evaluating

whether the claimant has met this burden, the examiner must consider the following four factors: (1)

objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain;

(4) the claimant's age, education and work history.  Id., at 1005. Once a claimant meets this burden, it

becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in

another kind of substantial gainful employment which exists in significant numbers in the national

economy, given the claimant's residual functional capacity and age, education, and work history.

Sryock v. Heckler, 764 F.2d 834 (11th Cir. 1985).  If the Commissioner can demonstrate that there

are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order

to be found disabled. Jones v. Apfel, 190 F.3d 1224, 1228 (11th  Cir. 1999). See also Hale v. Bowen,

831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir.

1985)).

### C.    Medical Evidence

On December 7, 2000, plaintiff was hospitalized for seven days following an automobile

accident.  She was diagnosed with a pelvic fracture, bruising and a laceration near her right eye, right

rib fractures, a "small liver laceration" and a "right kidney laceration." (Tr. 138-139, 148, 151, 156).

The pelvic x-ray showed a "small fracture of the acetabulum"[3] of the right hip and mild osteoarthritis.

(Tr. 139, 160).  The x-rays of plaintiff's right hand, right shoulder, and cervical, thoracic and lumbar

spine were interpreted as normal and without fracture. (Tr. (Tr. 138-139, 154, 155, 157, 161-162).

The cervical spine x-ray showed "moderate degenerative disc disease" at the C4-5 vertebrae with

"small posterior osteophytic bar". (Tr. 144).  For part of her stay plaintiff was admitted to neurological

intensive care unit because of confusion.  The CT scan of her head showed no fractures, "no midline

shift, subdural or epidural hematoma, area of intracerebral hemorrhage, mass or ventricular

abnormality" and was interpreted as normal. (Tr. 138, 152).  At discharge, the doctor noted plaintiff as

alert and oriented, followed commands, moved all extremities well and was walking with a walker. (Tr.

139).

      After her accident, plaintiff was treated by John D. Crompton, M.D., orthopedist, for right hip

and groin pain, weakness in her right lower extremity, and numbness and tingling in two toes of her left

foot.  He noted her right leg strength was 4/5 and she had "reasonable range of motion" of the right hip

"without a lot of pain." (Tr. 203).  Her lumbar spine MRI was showed mild disc degeneration at L5-

S1, but it was interpreted as a negative scan with no significant abnormality. (Tr. 202, 201).

      On February 1, 2001, plaintiff returned to Dr. Crompton with complaints of headache and

weakness on her right side.  Plaintiff was still taking physical therapy and using a walker.  He

_____

[3] "The cup-shaped cavity at the base of the hipbone into which the ball-shaped head of the femur fits." The American Heritage® Dictionary of the English Language, 4th Ed.© (2004, 2000).

recommended a change in her therapy protocol.  (Tr. 201).   He also noted that plaintiff

> feels like her problems with her head, upper extremity and lower extremity are
> secondary to "closed head injury".  I explained to her that the term "closed head injury"
> has many different ramifications, but that I was unaware of any specific problems she
> had that would lead to ongoing weakness.

(Tr. 201).

On examination, Dr. Crompton noted plaintiff ambulates with a walker and "she says her right

lower extremity is weak.  It is hard to tell if she is fully cooperative with the exam or not." (Tr. 201).

Dr. Crompton recommended nerve conduction studies.

On February 6, 2001, plaintiff was treated by John Brockington, M.D., neurologist, on referral

from Dr. Crompton for complaints of numbness in the left foot and mild symptoms in the right lower

arm. (Tr. 221).  Her nerve conduction study was interpreted as follows:

> These electrophysiologic findings are indicative of a left posterior tibial neuropathy,
> predominantly involving the distal segments.  The abnormalities noted in the sural
> sensory nerves bilaterally[4] and in the right peroneal motor nerve[5] are mild and of
> questionable clinical significance.  However, this does raise the question as to whether
> there may be a subtle underlying generalized neuropathy.  The abnormalities noted in
> the left posterior tibial nerve are disproportionately severe in comparison to these
> findings.

(Tr. 221).   Plaintiff began outpatient physical therapy on February 7, 2001. (Tr. 196).

On February 27, 2001, plaintiff returned to Dr. Crompton who noted plaintiff complained of a

mild limp but was "definitely improving." (Tr. 197).  He noted a "mild antalgic gait" and acknowledged

---

[4]  The sural nerves are in the ankle. National Library of Medicine, National Institutes of Health.
http://www.nlm.nih.gov/medlineplus

[5]  "The peroneal nerve is a branching of the sciatic nerve, which supplies movement and
sensation to the lower leg, foot and toes."  National Library of Medicine, National Institutes of Health.
http://www.nlm.nih.gov/medlineplus

the nerve conduction study findings of posterior tibial neuropathy and a possible generalized

neuropathy.  He recommended plaintiff continue therapy. (Tr. 197).

> On March 30, 2001, plaintiff's physical therapist noted she was
>
> now [independent] in ambulation [without] assistive device for community distances
> including grocery shopping.  Reports performing house cleaning, etc. [without]
> difficulty.  Now using Cybex equipment for quad/ham strengthening [with] weights of
> 25# to 37.5# for 20 -25 reps each.

(Tr. 196).

> On March 5, 2001, Dr. Brockington examined plaintiff and noted her reports of paresthesias[6]

with numbness in her left foot, some paresthesias of her right foot, weakness of her right leg, occasional

mild paresthesias in her right hand, fatigue, dizziness with walking particularly if she stands and looks up.

He noted her history of the automobile accident and treatment for thyroid disease. (Tr. 219).  Following

the examination, Dr. Brockington noted that the neuropathy may be a consequence of the accident

though there was "no evidence of clear focal compression in the usual sites . . . on nerve conduction

testing."  (Tr. 220).  He also noted that plaintiff "may be at risk for a generalized neuropathy with her

hypothyroid disease." (Tr. 220).  He then stated as follows:

> I told her that based on the nerve conduction testing, I do think that there will be some
> improvement in her symptoms, but that this will be quite slow.  Her gait instability and
> vertigo type symptoms I suspect are a consequence of her underlying subtle
> neuropathy, and hopefully this will improve with her thyroid replacement treatment.

(Tr. 220).  Dr. Brockington noted that plaintiff was taking physical therapy and that she should return in

---

[6]Paresthesia is defined as a "sensation of pricking, tingling, or creeping on the skin having no
objective cause and usually associated with injury or irritation of a sensory nerve or nerve root."
MERRIAM-WEBSTER'S MEDICAL DESK DICTIONARY  (1996).

several weeks.  (Tr. 220).

Plaintiff returned on April 2, 2001, and reported the same symptoms but with stiffness and decreased range of motion in the right shoulder.  She also reported "significant problems with memory as well as attention and concentration, and frequency of headaches." (Tr. 217).  On physical examination, Dr. Brockington found decreased range of motion in the right shoulder but no atrophy, "mild right upper extremity pronator drift", persistent weakness in the right quadriceps, hand strength, and anterior tibialis at 4-4+/5 which was unchanged since March 2001. (Tr. 217).  Dr. Brockington noted the cognitive impairment was possibly due to the head injury and ordered an MRI.  He also ordered an x-ray of plaintiff's shoulder.  He requested that plaintiff continue physical therapy because of the persistent weakness and deficits in her right lower extremity. (Tr. 217).  An x-ray of plaintiff's shoulder showed no evidence of bony abnormality or soft tissue abnormality. (Tr. 218).  The MRI of plaintiff's shoulder was interpreted as showing "mild tendinosis, subacromial bursal fluid (possibly correlated with bursitis) and AC joint [7] and acromial changes. (Tr. 215).  The MRI of plaintiff's brain was normal. (Tr. 216).

On April 25, 2001, plaintiff returned to Dr. Brockington with continued complaints and also right knee pain exacerbated by weight lifting therapy.  He noted his impression that plaintiff should stop weight lifting but continue other conditioning exercises.  He noted his thoughts that plaintiff's "dizziness and slowed cognitive function and decreased attention are most likely due to her thyroid disease, and it

---

[7] The acromioclavicular (AC) joint is located at the top of the shoulder where the clavicle (collarbone) meets an extension of the shoulder blade called the acromion. The AC joint is not the shoulder joint. The Physician and Sports Medicine, Vol 29, No.11 (November 2001). www.sportsmedicine.com/issues/2001.

may be a month or two before she begins to notice significant improvement in these regards. . . .  There

is no gross evidence on MRI of any structural abnormalities which could possibly be provoking

memory and attention decreases." (Tr. 214).

On May 2, 2001, the physical therapist noted plaintiff had twenty-three sessions for

strengthening her extremities and balance training.  At discharge, plaintiff was ambulating independently,

walking 2.3 miles per hour at a five per cent grade for ten minutes, and was able to lift twenty-five

pounds overhead.  The discharge summary indicates that therapy was discontinued at plaintiff's

doctor's request. (Tr. 195).

On October 23, 2001, plaintiff was consultatively examined by S. D. Steele, M.D. (Tr. 205-

207).  Plaintiff reported chronic headaches, pain in the right shoulder and right hip, numbness in the left

foot and thigh, dizziness, and weakness. (Tr. 205).  On examination, Dr. Steele found normal range of

motion of all joints but for the right shoulder where he found pain on palpation and stiffness "but no

significant reduction in the range of movement." (Tr. 206).   He also found "some numbness, scattered

paresthesias on the right thigh and left lower extremity below the knee." (Tr. 206).   He also noted Dr.

Brockington's finding of left posterior tibial neuropathy.  Dr. Steele concluded plaintiff's "functional

impairment is moderate and ongoing conservative medical management is recommended." (Tr. 206-

207).

On November 30, 2001, plaintiff was evaluated by Jerry Gragg, Psy.D. (Tr. 208-211).  He

noted plaintiff's report of her familial, personal, educational, social and medical history.  Plaintiff

reported that she still experiences memory loss and weakness on her right side since her accident.  She

reported taking Zoloft, thyroid medications, muscle relaxers at night and an anti-inflammatory.  She also

reported seeking treatment for stress but not for mental illness and that her neurological evaluation had

shown mild abnormalities. (Tr. 209).

Dr. Gragg found plaintiff appeared normal but for a "slightly abnormal gait that she attributed to

'weakness' in her right side." (Tr. 209).  He also noted that

> [c]ontrary to self report, her memory functioning appeared to be within normal limits,
> and she was well oriented in all spheres.  The claimant's attention and concentration
> capacity was mildly impaired, but her fund of general information was appropriate to
> her education level.  Her abstract reasoning was good, and her judgment for
> hypothetical situations and her insight were within normal limits.  Her intellectual level
> was estimated to lie in the average range of general intelligence.

(Tr. 209).  Plaintiff reported chronically low energy level secondary to her right side paralysis, and that

she arose each day at 5:45 a.m., completed light housework but "her weakness precludes strenuous

physical activity", and went to bed around 10:p.m. (Tr. 210).  She reported that her children help her

with shopping or heavy cleaning.  (Tr. 210).

In summary, Dr. Gragg found as follows:

> Ms. Brown's cognitive functioning appears generally unimpaired and she should
> experience no difficulty understanding instructions.  She should have no trouble
> responding appropriately to supervision or interacting effectively with coworkers.  The
> claimant expressed a strong desire to return to work but feels that her ability to handle
> work pressures and physical demands may be significantly limited, given her physical
> condition.  There is some constriction of interest and restriction of activity but they
> appear to be related to physical concerns rather than psychological problems.  Based
> on self-report and DDS records, she has limited physical mobility and chronic
> weakness, precluding many types of work.  She appears unable to function in a
> completely independent manner at this time.  However, she can handle [her] financial
> affairs, if necessary.

(Tr. 211).

On December 12, 2001, plaintiff was treated at the emergency room because she was kicked

by a horse and was diagnosed with a soft tissue injury to the left lower leg. (Tr. 386-397).  She

reported her pain as level three. (Tr. 386).  Plaintiff had swelling and bruising to her left lower leg. (Tr.

388).  She was treated with an ace wrap. (Tr. 390).  Her x-ray showed no bony injury. (Tr. 397).  At

discharge, she was advised to rest, elevate her leg and apply ice for thirty minutes four times a day. (Tr.

391, 396).  She was given Naproxen to take twice a day and advised to take activity as tolerated. (Tr.

391).

On May 14, 2002, plaintiff returned to Dr. Brockington with complaints of worsening pain,

paresthesias and weakness in her right shoulder, arm and leg.  On examination he noted plaintiff was

"[a]lert, attentive, with no evidence of sedation or lethargy." (Tr. 213).  He also noted mild distal

weakness in the right extremities bilaterally of 4+/5 to 5-/5, mild pronator drift bilaterally, deep tendon

reflexes decreased symmetrically in the arms, and "no evidence of progressive atrophy." (Tr. 213).  He

thought her problems were due to an "underlying neuropathy" and possibly her shoulder injury but

ordered a cervical spine MRI to evaluate plaintiff for cervical radiculopathy.  Again, he thought her

thyroid problems could be the basis for some of her complaints. (Tr. 213).

Plaintiff returned on June 20, 2002, and Dr. Brockington reported that plaintiff's cervical spine

MRI showed "evidence of osteophyte formation with foraminal stenosis" and that her right hip MRI

showed "evidence of traumatic calcification of the proximal aspect of her right femur." (Tr. 212).   He

also noted that plaintiff's nerve conduction studies of the upper extremities showed "evidence of

generalized neuropathy." (Tr. 212).  He noted plaintiff was scheduled to see an endocrinologist for

thyroid surgery.  Dr. Brockington found plaintiff was "[a]lert, attentive, with no significant sedation or

lethargy." (Tr. 212).  He noted his impression of "[p]eripheral neuropathy, most likely due to

16

hypothyroidism, with patient on thyroid replacement hormone" and that plaintiff's "neck and right hip pain are due to degenerative disease, and we will refer her to physical therapy but aside from that, I do not think there is much else we can offer her as far as relief in a long-term sense". (Tr. 212).

On June 26, 2002, plaintiff's thyroid was removed.  Post-surgery, she was treated with thyroid medication. (Tr. 222-228, 346-385).  She obtained wound care on July 5, 2002. (Tr. 325-345).  Her current medications were noted as Advil as needed and Zoloft. (Tr. 330).

On August 23, 2002, plaintiff was injured in an automobile accident. (Tr. 304-324).  She reported chest pain "at level 3- moderate". (Tr. 308).  She reported her current medications were Synthroid, Zoloft and Zocor. (Tr. 309).   She was diagnosed with a chest wall contusion. (Tr. 317).   At discharge she was advised to take 600mg Motrin every six to eight hours as needed for pain and inflammation, take activity as tolerated, and apply cool compresses to her chest wall four times a day. (Tr. 314).  Her cervical spine x-ray indicated some straightening of the cervical spine which the radiologist thought might be related to muscle strain.  The radiologist also noted "mild discogenic degenerative changes at C5-6 and C4-5" but no other abnormality. (Tr. 321).

On September 12, 2002, plaintiff was treated on follow-up by Dr. Brockington for complaints of "weakness and paresthesias[8] attributed to thyroid disease". (Tr. 403).  Dr. Brockington noted plaintiff's history of thyroidectomy, treatment with thyroid hormone replacement, and an automobile accident on August 23, 2002 with injury to her chest and right shoulder.  He noted her report of distal right arm pain and numbness and that she "does not have any proximal radiating pain or paresthesias

involving her upper arm or shoulder." (Tr. 403).  He noted that plaintiff wanted to have a nerve

conduction study and that she had "nerve conduction studies performed in the distant past, which did

show an evidence of generalized neuropathy." (Tr. 403).  On examination, Dr. Brockington noted

plaintiff demonstrated "intact short-, intermediate-, and long-term memory function." (Tr. 403).  He

also noted weakness of the distal right upper extremity of 4+/5 to 5-/5 without evidence of atrophy of

the intrinsic hand muscles and "decreased pinprick sensation in the distal right upper extremity" in a

"circumferential pattern". (Tr. 403).  He noted plaintiff's deep tendon reflexes were "decreased but

symmetrical in the upper bilaterally" and that her "[g]ait is stable with no ataxia."[9] (Tr. 403).

Dr. Brockington reported his impression of paresthesias and weakness possibly due to

traumatic compression in the accident "with an underlying neuropathy exposing patient to more severe

injuries from compression." (Tr. 403).  He requested nerve conduction studies and advised plaintiff to

continue taking Neurontin as needed for her pain. (Tr. 403).

On October 17, 2002, plaintiff was evaluated by John R. Goff, Ph.D. (Tr. 229-243).  Dr. Goff

summarized plaintiff's past medical history from records provided by her counsel. (Tr. 229- 230).  He

also interviewed plaintiff and recorded her report of her accident, mental trauma,  neurological (difficulty

with cognition and poor memory) and orthopedic deficits, and hypothyroidism. (Tr. 231-232).  Dr.

Goff noted plaintiff was currently taking Zoloft, Synthroid, Neurontin and Lodine for pain from her

orthopedic injuries. (Tr. 230).  Dr. Goff administered a test to ascertain dissimulation or symptom

_____

[9] Ataxia is defined as "an inability to coordinate voluntary muscular movements that is
symptomatic of some nervous disorders." MERRIAM-WEBSTER'S MEDICAL DICTIONARY  (2003).
http://www.2merriam-webster.com.

exaggeration and found that plaintiff was not so inclined "at least in regard to cognitive issues." (Tr.

231).  He administered the "Wechsler Adult Intelligence Scale (WAIS-III), the Reitan-Indiana Aphasia

Screening Test, informal clock drawing tasks, a Sensory Perceptual Examination, examination of motor

speed, strength, dexterity, the Wechsler Test of Adult Reading (WTAR) and selected subtests from the

third edition of the Wechsler Memory Scale (WMS-III)."  (Tr. 231).  Dr. Goff concluded that plaintiff

"appears to be functioning within the low average to average range of psychometric intelligence[10] "[t]his

appears to represent a decline from previous levels of function as described above." (Tr. 233).   On

memory testing, plaintiff scores were interpreted as average. (Tr. 232).  He diagnosed a "cognitive

disorder (loss) following TBI"[11] and an "adjustment disorder with mixed features." (Tr. 233).  Dr. Goff

noted that the

> adjustment disorder actually relates to the patient's perceptions of the difficulties that
> she is having.  She sees herself as being quite substantially impaired.  Her perception of
> this may not mirror the number values we are obtaining for her, but particularly the
> motor slowness seems to be troublesome to her.  It would, of course, interfere
> substantially with the sorts of work she was doing prior to the accident and I do think
> that the cognitive deficits she demonstrates represent a moderately severe impairment at
> this time.

(Tr. 233).  He completed a medical source statement wherein he found plaintiff had mild impairment of

the ability to ask simple questions or request assistance. (Tr. 234).  He found plaintiff had a moderate

impairment of the ability to interact appropriately with the general public, get along with co-workers or

peers, personal habits, daily activities, sustain a routine without supervision, complete a normal

---

[10]  On the WAIS-III, plaintiff obtained a full scale IQ score of 94, a verbal scale IQ score of
95, and a performance or visuopractic IQ score of 92. (Tr. 231).

[11] This medical acronym is not defined in the opinion but it appears to mean traumatic brain
injury.

workday without interruption from a psychologically based symptom and maintain consistent pace

without an unreasonable number and length of rest periods, make simple work-related decisions,

respond appropriately to supervision, and be aware of normal hazards and take precautions. (Tr. 234-

236).   He found plaintiff had a marked impairment in regard to constriction of interests; the ability to

understand, remember and carry out simple instructions and repetitive tasks; maintaining attention and

concentration for extended periods; performing activities within a schedule, maintaining regular

attendance, and being punctual within customary tolerances; responding appropriately to changes in the

work setting and customary work pressures. (Tr. 234-236).   He found plaintiff was extremely limited in

the ability to understand, remember and carry out complex instructions. (Tr. 235).

On October 24, 2002, a nerve conduction study and electromyelogram were interpreted as

"indicative of bilateral carpal tunnel syndrome, worse on the right" (Tr. 405).   Also, on October 24,

2002, plaintiff was seen by Dr. Brockington.   He noted plaintiff thought her carpal tunnel syndrome had

worsened with loss of strength and pain in her right hand.   He noted she was currently taking no anti-

inflammatory medication and was not using a wrist brace.   On cognitive examination, he concluded

plaintiff demonstrated "intact short, intermediate, and long term memory function." (Tr. 402).   On

physical examination, he identified "significant weakness of the right hand grip, grade 4+/5, mild

weakness of the left hand grip, grade -5/5 with subtle atrophy noted of the right thenar [thumb]

eminence region." (Tr. 402).   He found plaintiff's deep tendon reflexes in the upper extremities were

decreased but symmetric.   He recommended conservative treatment with splints and an anti-

inflammatory medication. (Tr. 402).

On January 12, 2003, plaintiff fell two feet off of a porch, hit her forehead and hurt her right

side.  She was taken to the emergency room by her husband. (Tr. 267-303, 292, 294).  She reported

that her pain was "at level 3- moderate." (Tr. 271).  The CT scan showed no evidence of injury,

although the radiologist was unsure whether one break of one rib was new or old. (Tr. 299-302).  She

was treated with intramuscular pain medication, given a prescription for pain medication, her right arm

was placed in a sling, and she was released on January 13, 2003.  She was advised to remain on bed

rest at home for twelve hours, then activities as tolerated.  (Tr. 287).  Her current medications were

listed as Neurontin as needed for headaches, Synthroid (thyroid medication) and Zoloft (an anti-

depressant). (Tr. 283).

On March 27, 2003, plaintiff returned to Dr. Brockington with complaints of paresthesias,

weakness from nerve injury, memory loss, difficulty with attention and concentration, mood swings,

difficulty with decision-making, forgetting immediate information, forgetting dates and other important

information and agitation. (Tr. 401).  Dr. Brockington noted he had not seen plaintiff since October 24,

2002.  He reported plaintiff was taking Zoloft which did not appear to alleviate her symptoms and

Bextra for carpal tunnel syndrome which appeared stable.  On cognitive assessment, Dr. Brockington

noted as follows:

> Demonstrates the patient to be somewhat tangential, with decreased immediate memory
> function, intact intermediate and long-term memory function. Speech is clear with no
> dysarthria or aphasia. Face is symmetric.  There is persisting mild weakness of the distal
> upper extremities bilaterally, somewhat worse on the right, with no evidence of
> progressive atrophy.  Deep tendon reflexes are symmetric bilaterally. [12]

---

[12]  Aphasia is defined as "impaired expression or comprehension of written or spoken
language."  Dysarthria is defined as "difficult, poorly articulated speech, such as slurring." Medical
Encyclopedia, National Library of Medicine, National Institutes of Health.
http://www.nlm.nih.gov/medlineplus

(Tr. 401).  Dr. Brockington determined that plaintiff's carpal tunnel syndrome could be conservatively

managed so long as she did not become progressively weak or lose function. He also noted as follows:

> Her cognitive complaints seem to be consistent with the mechanism of injury in
> December 2000, and given the duration of time that has passed, it is unlikely that there
> will be major improvement now, and this may essentially affect her job performance.  I
> do not think that her current medications are interfering with her ability to function
> otherwise.  We will keep her on the same regimen as above, and she will let me know if
> she has any new or progressive problems but otherwise will return to see me on an as
> needed basis. I discussed this plan at length with the patient who indicated
> understanding and had no additional questions.

(Tr. 401).

### D.    Plaintiff's Argument

**1. Whether the Administrative Law Judge (ALJ) erred by failing to give proper weight
to the opinions of plaintiff's treating physicians, Dr. Brockington and Dr. Crompton, and the
examining psychologist, Dr. Goff.**

Plaintiff argues that the ALJ selectively chose portions of the treatment notes of Dr. Brockington

and Dr. Crompton which indicated improvement and ignored other objective findings in their records

which support her subjective complaints of pain and other symptoms.  Specifically, plaintiff points to the

results of the nerve conduction study as noted by her orthopedist,[13]  the cervical and hip MRI's as

interpreted by her neurologist,[14] her neurologist's statement to the effect that he had nothing else to

---

[13] On February 27, 2001, at her last visit with Dr. Crompton, he noted the nerve conduction
study findings of posterior tibial neuropathy and a possible generalized neuropathy. (Tr. 197).

[14]  On June 20, 2002, Dr. Brockington reported plaintiff's cervical spine MRI showed
"evidence of osteophyte formation with foraminal stenosis", her right hip MRI showed "evidence of
traumatic calcification of the proximal aspect of her right femur," and that her nerve conduction studies
of the upper extremities showed "evidence of generalized neuropathy." (Tr. 212).

"offer as far as relief in a long-term sense", and his findings regarding the permanence of plaintiff's

impaired cognitive function, its consistency with her injury, the unlikelihood of future improvement, and

possible affect upon job performance.[15] (Tr. 197, 212, 401).

Review of the ALJ's decision shows that he did not fail to give proper weight to the opinions of

Dr. Crompton and Dr. Brockington in regard to plaintiff's exertional and postural functional limitations

but instead relied upon medical evidence in the physicians' records to reach his decision.  The ALJ has

the administrative duty to determine plaintiff's residual functional capacity.  See Social Security Ruling

96-8p: Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184,

*2.  Because this determination is an "administrative assessment", it is the ALJ's function to determine

the plaintiff's RFC through examination of the evidence and resolution of conflicts in the evidence.

Wolfe v. Chater, 86 F.3d 1072, 1079 (11th Cir. 1996); 20 C.F.R. § 404.1546, 20 C.F.R. § 416.946.

See Higgins v. Barnhart, 2002 WL 1752231 *7 (7th Cir. Ind) citing Schmidt v. Apfel, 201 F.3d 970,

972 (7th Cir. 2000) ("We will not substitute our own judgment for the ALJ's when two plausible

_____

[15] On March 27, 2003, Dr. Brockington found plaintiff was "somewhat tangential, with
decreased immediate memory function, intact intermediate and long-term memory function." (Tr. 401).
He also noted as follows:

> Her cognitive complaints seem to be consistent with the mechanism of injury in
> December 2000, and given the duration of time that has passed, it is unlikely that there
> will be major improvement now, and this may essentially affect her job performance.  I
> do not think that her current medications are interfering with her ability to function
> otherwise.  We will keep her on the same regimen as above, and she will let me know if
> she has any new or progressive problems but otherwise will return to see me on an as
> needed basis. I discussed this plan at length with the patient who indicated
> understanding and had no additional questions.

(Tr. 401).

conclusions can be drawn from the same evidence.").

In regard to Dr. Crompton, plaintiff relies upon the treatment notes from his last examination on February 27, 2001, approximately six weeks after the accident wherein he noted plaintiff complained of a mild limp but was "definitely improving." (Tr. 197).  Dr. Crompton also noted a "mild antalgic gait" and acknowledged the nerve conduction study findings of posterior tibial neuropathy of the left leg and a possible generalized neuropathy. (Tr. 197).  The ALJ also relied upon these same treatment notes, specifically Dr. Crompton's finding of improvement, to discredit plaintiff's subjective allegations. (Tr. 20).  Plaintiff may prefer that the ALJ focus upon the findings of a mild antalgic gait and neuropathy; however, Dr. Crompton with knowledge of these objective medical test results unequivocally stated that plaintiff was "definitely improving". (Tr. 197).  Dr. Crompton received the intermittent physical therapy reports which support his opinion of plaintiff's improvement. (Tr. 195-203).  The undersigned finds that the ALJ did not err by relying upon Dr. Crompton's opinion and records as support for the RFC and credibility determination.

In regard to Dr. Brockington, plaintiff relies upon the June 20, 2002, examination report wherein Dr. Brockington noted plaintiff's cervical spine MRI showed "evidence of osteophyte formation with foraminal stenosis", her right hip MRI showed "evidence of traumatic calcification of the proximal aspect of her right femur", and noted plaintiff's nerve conduction studies of the upper extremities showed "evidence of generalized neuropathy." (Tr. 212).  At this same examination, Dr. Brockington noted his impression of "[p]eripheral neuropathy, most likely due to hypothyroidism, with patient on thyroid replacement hormone" and that plaintiff's "neck and right hip pain are due to degenerative disease, and we will refer her to physical therapy but aside from that, I do not think there

24

is much else we can offer her as far as relief in a long-term sense". (Tr. 212).  Again, plaintiff may

prefer that the ALJ focus upon the findings that when pulled from the report are most favorable to her.

However, despite his statement, Dr. Brockington did not place any exertional or postural functional

restrictions or limitations upon the plaintiff, prescribe pain medication, recommend surgery, or refer her

for pain management, but instead recommended only physical therapy. (Tr. 212).  Also, at plaintiff's

October 24, 2002 visit, Dr. Brockington did not discuss any medical findings related to the neuropathy

of her left leg, or the MRI findings regarding her neck or right hip,[16] but instead assessed the symptoms

of carpal tunnel syndrome which he decided to conservatively treat plaintiff with splints and non-

steroidal anti-inflammatory medication. (Tr. 402, 405 ).  At the next and last visit on March 27, 2003,

Dr. Brockington noted plaintiff was taking Bextra for carpal tunnel syndrome which appeared stable

and again discussed only treatment related to carpal tunnel syndrome. (Tr. 401).  Accordingly, the

undersigned finds that the ALJ did not err by relying upon Dr. Brockington's opinions and treatment

records as support for the RFC and credibility determination.

　　　　Plaintiff also argues that the ALJ improperly gave little weight to the opinion of John Goff, Ph.D,

the examining psychologist.  Plaintiff argues that Dr. Goff's opinion was supported by Dr.

Brockington's findings.  Plaintiff points out that Jerry Gragg , a clinical psychologist, performed the

"other mental examination" referenced by the ALJ, but that Dr. Goff's opinion should be given more

weight because he is a neuropsychologist and more qualified to give an opinion about cognitive disorder

---

[16]  On August 23, 2002, when plaintiff was involved in a second automobile accident, the
radiologist noted "mild discogenic degenerative changes at C5-6 and C4-5" but no other abnormality.
(Tr. 321).  These records do not appear to be before Dr. Brockington but support his decision not to
pursue further treatment for plaintiff's cervical disc disease.

resulting from a closed head injury. 20 C.F.R. § 404.1527(d)(5).  Plaintiff also argues that Dr. Goff

reviewed the records, performed a mental status examination, and administered objective clinical tests,

but Dr. Gragg administered no tests which leaves his opinion without objective support.  Plaintiff points

out that the regulations require deferring to an opinion that is supported by objective testing and that Dr.

Goff's testing constitutes a "medically acceptable diagnostic technique." 20 C.F.R. § 404.1528(b).

The ALJ found plaintiff's impairments result in a mild restriction of her daily activities, moderate

difficulties in maintaining social functioning, moderate deficiencies of concentration, persistence or pace,

but would never result in episodes of decompensation or deterioration. (Tr. 21).  He also found plaintiff

would

> have moderate or less restrictions in all areas as to her ability to cope with the mental
> demands of the workplace, has never had an episode of decompensation of extended
> duration due to a mental impairment, has a verbal IQ of 94, performance IQ of 95, and
> a full scale IQ of 92, and has the ability to remember simple instructions[.]

(Tr. 22).  In reaching this decision, he noted plaintiff's November 2001 examination by Dr. Gragg[17]

---

[17]    In summary, Dr. Gragg found as follows:

Ms. Brown's cognitive functioning appears generally unimpaired and she should
experience no difficulty understanding instructions.  She should have no trouble
responding appropriately to supervision or interacting effectively with coworkers.  The
claimant expressed a strong desire to return to work but feels that her ability to handle
work pressures and physical demands may be significantly limited, given her physical
condition.  There is some constriction of interest and restriction of activity but they
appear to be related to physical concerns rather than psychological problems.  Based
on self-report and DDS records, she has limited physical mobility and chronic
weakness, precluding many types of work.  She appears unable to function in a
completely independent manner at this time.  However, she can handle [her] financial
affairs, if necessary.

(Tr. 211).

indicated her "cognitive functioning was unimpaired" and that Dr. Goff found plaintiff's "memory test

results indicated average scores." (Tr. 21).  He also noted plaintiff's cognitive test results "have been

normal, average, or described as only 'slight' or 'mild'" and that

> Dr. Goff diagnosed [plaintiff] as having adjustment disorder and she testified that she
> takes medication for her 'mood swings'.  The undersigned notes [that plaintiff] is not
> treated by a mental health professional and has not sought any mental health treatment.
> She testified she has friends and gets along well with family members.

(Tr. 21).  The ALJ then found that the

> objective evidence does not confirm either the severity of her alleged symptoms arising
> from her medically documented conditions or that those conditions could reasonably be
> expected to give rise to the alleged symptoms of severe cognitive difficulties.  The
> restrictions placed on the claimant by Dr. Goff are not supported by the record as a
> whole, including claimant's activities of daily living and examinations (mental) by other
> practitioners of record.  Accordingly the undersigned accords little weight to the opinion
> of Dr. Goff concerning the level of the claimant's cognitive impairment and finds that
> claimant's cognitive disorder, if any, is no more than moderate in severity.

(Tr. 21).

Review of the ALJ's decision shows that he did not err in giving little weight to Dr. Goff's

opinion regarding plaintiff's mental restrictions as identified in his medical source statement.  Moreover,

the ALJ's opinion is supported by substantial evidence in the record including the mental examination

report from Dr. Gragg and plaintiff's daily activities.  See Bloodsworth v. Heckler, 703 F.2d 1233,

1240 (11th Cir. 1983) citing  Oldham v. Schweiker, 660 F.2d 1078, 1084 (5th Cir. Unit B 1981)

("Further, the Secretary may reject the opinion of any physician when the evidence supports a contrary

conclusion.").  Dr. Goff who performed a single consultative examination of the plaintiff is not entitled to

the deference given to the opinions of treating physicians.  See McSwain v. Bowen, 814 F.2d 617, 619

(11th Cir. 1987) (a one-time examiner is not a treating physician); Gibson v. Heckler, 779 F.2d 619,

623 (11th Cir.1986) ("Finally, the reports of Drs. Davis and Simpson are not supported by specific clinical evidence.  Also their opinions are not entitled to deference because as one-time examiners they were not treating physicians.").

At the hospital admission for her automobile accident, the medical doctors and nurses reported plaintiff was confused and she was placed in neurointensive care.[18]  After her confusion diminished she was moved to another floor.  At discharge, her diagnosis did not include a closed head injury and the CT scan of her head did not show any injury. (Tr. 138-139, 148, 151, 152, 156).  After the accident plaintiff was treated by Dr. Crompton, an orthopedist, and his records make no reference to any mental functional impairment. (Tr. 195-203).  He also noted plaintiff

> feels like her problems with her head, upper extremity and lower extremity are secondary to "closed head injury".  I explained to her that the term "closed head injury" has many different ramifications, but that I was unaware of any specific problems she had that would lead to ongoing weakness.

(Tr. 201).

Also after the accident, Dr. Brockington, the neurologist, treated plaintiff for paresthesias, weakness and complaints of  "significant problems with memory as well as attention and concentration, and frequency of headaches" and on April 2, 2001, he noted the cognitive impairment was possibly due to the head injury. (Tr. 217).  However, on April 25, 2001, he noted that plaintiff had begun treatment for her thyroid condition and that her

> dizziness and slowed cognitive function and decreased attention are most likely due to her thyroid disease, and it may be a month or two before she begins to notice significant improvement in these regards. . . .  There is no gross evidence on MRI of any structural

---

[18] Plaintiff tested positive for methamphetamine and amphetamine upon admission.  (Tr. 165).

abnormalities which could possibly be provoking memory and attention decreases.

(Tr. 214). Thus, it appears that plaintiff's own neurologist did not specifically diagnose a closed head injury. Inconsistently and almost two years later, Dr. Brockington finds plaintiff's cognitive complaints "seem to be consistent with the mechanism of injury in December 2000, and given the duration of time that has passed, it is unlikely that there will be major improvement now, and this may essentially affect her job performance." (Tr. 401).

Moreover, in all but his last examination of plaintiff, Dr. Brockington found her short, intermediate and long-term memory were intact and noted no cognitive impairment. On September 12, 2002 and October 24, 2002, Dr. Brockington noted plaintiff demonstrated "intact short-, intermediate-, and long-term memory function." (Tr. 402, 403). On March 27, 2003, Dr. Brockington noted plaintiff was "somewhat tangential, with decreased immediate memory function, intact intermediate and long-term memory function." (Tr. 401). Additionally, at four examinations, Dr. Brockington noted that he discussed his plans "at length with the patient who indicated understanding and had no additional questions." (Tr. 401, 402, 212, 220). Also, on May 14, 2002, and June 20, 2002, Dr. Brockington noted plaintiff was alert and attentive. (Tr. 213, 212).

Further, the undersigned finds that the ALJ did not err by relying upon plaintiff's testimony regarding her daily activities to give less than full weight to Dr. Goff's opinion. Plaintiff testified that she is independent in her personal hygiene and eats regular meals, rises each day around six o'clock and gets her children off to school, and goes to bed around nine o'clock or ten o'clock. (Tr. 45, 46). She testified she can cook and do a little bit of housework but can not sweep, mop, make beds, or grocery shop without some help. She has a few friends and gets along okay with her family. (Tr. 46). Thus,

while her daily activities may be somewhat limited by her need for help with heavy housework and

grocery shopping, she does not exhibit extreme or marked restrictions. (Tr. 234-236).

The undersigned also finds that the ALJ did not err by relying upon the opinion of Dr. Gragg  in

deciding to give less than full weight to Dr. Goff's opinion, even though Dr. Goff administered objective

clinical tests which Dr. Gragg did not administer.   Dr. Gragg conducted a mental status examination

and determined that

> [c]ontrary to self report, her memory functioning appeared to be within normal limits,
> and she was well oriented in all spheres.  The claimant's attention and concentration
> capacity was mildly impaired, but her fund of general information was appropriate to
> her education level.  Her abstract reasoning was good, and her judgment for
> hypothetical situations and her insight were within normal limits.  Her intellectual level
> was estimated to lie in the average range of general intelligence.

(Tr. 209).   Dr. Goff made almost the same findings after he administered the various diagnostic tests.

He found plaintiff was of average intelligence and memory after administering the WAIS-III and the

WMS. (Tr. 231-233).   However, he did determine that plaintiff's ability to maintain concentration and

attention was markedly impaired in contrast to Dr. Gragg's finding of a mild impairment of

concentration and attention. (Tr. 234-236, 209).   Additionally, even though Dr. Goff found marked and

extreme functional limitations in some areas of mental functioning as identified on his medical source

statement, he also found that the "cognitive deficits she demonstrates represent a moderately severe

impairment at this time." (Tr. 233).

Additionally, the undersigned finds that Dr. Gragg's opinion when considered in conjunction

with Dr. Brockington's notes regarding plaintiff's attention, concentration, memory and mental status

over the course of his treatment; the absence of report of memory, attention or concentration deficits in

Dr. Crompton's records; Dr. Goff's opinion that plaintiff had a moderate cognitive impairment with average memory and intellect; as well as plaintiff's report of her daily activities, constitute substantial evidence to support the ALJ's determination that plaintiff was moderately impaired in her ability to maintain concentration, persistence and pace and in the areas of mental functioning necessary for work performance. (Tr. 22).

**2. Whether the ALJ improperly assessed plaintiff's subjective complaints of pain and other symptoms.**

Plaintiff argues that the ALJ erred when he found she did not meet either of the two parts of the second prong of the Eleventh Circuit's pain standard as set forth in Landry v. Heckler, 782 F. 2d 1551, 1553 (11th Cir. 1986) and Hand v. Heckler, 761 F. 2d 1545, 1549 (11th Cir. 1985), and thus the ALJ improperly found her subjective complaints of pain and other symptoms were not credible. Specifically, plaintiff states that the ALJ properly recognized that the medical evidence established the first part, i.e., evidence of an underlying medical condition. Id.  However, plaintiff argues that the objective medical evidence also establishes that her cervical degenerative disc disease and traumatic compression of her right extremity as diagnosed by Dr. Brockington could reasonably be expected to produce the pain alleged and thus she meets the second part.  Plaintiff argues that because she met the second part, the ALJ was required to consider her subjective complaints along with other evidence; specifically, the opinions of her treating physicians which support her testimony of pain and limited range of motion.

Plaintiff also argues that the ALJ improperly assessed her subjective complaints of memory loss

and attention deficit.  Plaintiff relies upon the medical records from Dr. Brockington's evaluation of

March 27, 2003 (Tr. 401) and the evaluation submitted by Dr. Goff. (Tr. 229-243).  Plaintiff argues

that their records constitute substantial evidence to support her subjective allegations of cognitive

impairment and that the ALJ erred by finding that her cognitive functional limitations were moderate.

When a plaintiff alleges disability based upon subjective complaints of pain or other subjective

symptoms, those complaints are evaluated under the "pain standard" set forth in Landry v. Heckler,

782 F.2d 1551, 1553 (11th Cir. 1986); see also Foote v. Chater, 67 F. 3d 1553, 1560 (11th Cir.

1995); Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991).  The standard requires "(1) evidence of

an underlying medical condition and either (2) objective medical evidence that confirms the severity of

the alleged [complaint] arising from that condition or (3) that the objectively determined medical

condition is of such a severity that it can be reasonably expected to give rise to the alleged [complaint]."

Foote, 67 F. 3d at 1560; Holt, 921 F.2d  at 1223 (11th Cir. 1991) (citing Landry, 782 F.2d at 1553

(11th Cir. 1986)).  Plaintiff must provide objective medical evidence  in support of the underlying

medical condition and its severity. 20 C.F.R. § 404.1529; 20 C.F.R. § 416.929.  Plaintiff's statements

of subjective complaints or symptoms, standing alone, will not establish disability.  See Edwards v.

Sullivan, 937 F. 2d 580, 584 (11th Cir. 1991)(citing Landry, 782 F. 2d. at 1553).

If this standard is met, the ALJ must consider the plaintiff's subjective complaints.  Marbury v.

Sullivan, 957 F.2d 837, 839 (11th Cir. 1992).  The ALJ may reject the plaintiff's complaints as not

creditable, but the decision to do so must be supported by substantial evidence. Id.  Also, the ALJ must

explicitly state adequate reasons for rejecting the testimony.  Brown v. Sullivan, 921 F.2d 1233, 1236

(11th Cir.1991).  Additionally, the ALJ's decision must be supported by substantial evidence. Edwards,

937 F 2d at 584, McSwain v. Bowen, 814 F.2d 617, 619 (11ᵗʰ Cir. 1987). Moreover, the ALJ has

the duty to "examine the evidence and resolve any conflicting reports." See Wolfe v. Chater, 86 F. 3d

1072, 1079 (11ᵗʰ Cir. 1996). Therefore, when a plaintiff alleges symptoms greater than what would

reasonably be expected based upon the medical evidence, further evaluation is necessary. 20 C.F.R. §

404.1529; 20 C.F.R. § 416.929. Social Security Ruling 96-7p: Titles II and XVI: Evaluation of

Symptoms in Disability Claims: Assessing The Credibility of an Individual's Statements, 1996 WL

374186, states that an individual's symptoms may imply a level of severity which is greater than that

shown by objective medical evidence and that the ALJ must consider evidence of the following, in

addition to the objective medical evidence, in reaching a decision about plaintiff's credibility:

> 1. The individual's daily activities; 2. The location, duration, frequency, and intensity of
> the individual's pain or other symptoms; 3. Factors that precipitate and aggravate
> symptoms; 4. The type, dosage, effectiveness, and side effects of any medication the
> individual takes or has taken to alleviate pain or other symptoms; 5. Treatment, other
> than medication, the individual receives or has received for relief of pain or other
> symptoms; 6. Any measures other than treatment the individual uses or has used to
> relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20
> minutes every hour, or sleeping on a board); and  7. Any other factors concerning the
> individual's functional limitations and restrictions due to pain or other symptoms.

1996 WL 374186.

The Eleventh Circuit Court of Appeals has also held that the determination of whether objective

medical impairments could reasonably be expected to produce the pain or other subjective symptom

was a factual issue for determination by the Secretary and, therefore, "subject only to limited review in

the courts to ensure that the finding is supported by substantial evidence." Hand v. Heckler, 761 F.2d

1545, 1549 (11th Cir.), vacated for rehearing en banc, 774 F.2d 428 (1985), reinstated sub nom.

Hand v. Bowen, 793 F.2d 275 (11th Cir. 1986).

After applying the pain standard set forth in <u>Landry</u> and acknowledging his review of plaintiff's subjective complaints including her allegations of pain, the ALJ found that the evidence supports a finding that plaintiff has underlying medical conditions but "neither prong of part two is met for the reasons stated below." (Tr. 20).  The ALJ then explained that there was "no objective clinical evidence of a condition which could reasonably be expected to produce the level of pain and limitation of motion in the right shoulder and right hip, residuals of thyroidectomy, and symptoms of carpal tunnel syndrome, and other symptoms which the claimant alleges have precluded her from working." (Tr. 20).  He found that "the objective medical evidence does not confirm the severity of the claimant's alleged symptoms arising from her medically documented conditions." (Tr. 20).  He found that this was "consistent with the limited objective findings in the medical evidence compared with her subjective complaints, her response to treatment shown in the medical evidence and her testimony." (Tr. 20).

The ALJ then found plaintiff's allegations "only minimally credible." (Tr. 20).  He supported this decision with the following medical evidence in regard to her exertional and postural functional limitations: Dr. Crompton's treatment of plaintiff for several months after her accident and his notation at her last visit that plaintiff was "definitely improving"; Dr. Brockington's treatment of plaintiff for complaints of paresthesias in her lower extremities and upper right extremity and his MRI results which showed a normal brain and mild tendinosis of the right shoulder; the May 2001 report at discharge from physical therapy showing plaintiff could lift twenty-five pounds overhead which indicated her shoulder impairment would not prevent her from performing light exertional work; Dr. Steele's, the consultative medical doctor,  November 2001 notation that plaintiff had a "slightly abnormal gait" and normal range of motion in all joints even though she complained of pain and exhibited stiffness in her right shoulder;

34

the July 2002 treatment records following thyroid surgery which indicated plaintiff was "doing well" with "absolutely no complaints" and that her thyroid condition was under good control; Dr. Brockington's conservative treatment of plaintiff for carpal tunnel syndrome, without surgery, and his notation that her strength remained good; and the right hip MRI which showed evidence of traumatic calcification of the proximal aspect of the right femur but "no indication that this condition has caused any more than moderate pain." (Tr. 20-21)

The ALJ also supported his finding with evidence of plaintiff's daily activities based upon her testimony that she arose at 6:00 a.m. and went to bed around 9:00 or 10:00 p.m. as indicative of her ability to sustain a full eight-hour workday, that she performs some housework including dishes and meal preparation, and that she cares for her own personal needs and shops.  The ALJ found these "activities would indicate the claimant has the ability to stand, walk, lift, carry, reach, stoop and bend." (Tr. 21).

In regard to plaintiff's allegations of cognitive impairment, the ALJ supported his decision that her allegations were not supported by the record by reference to the following evidence: Dr. Gragg's November 2001, finding that her cognitive functioning was unimpaired; plaintiff's score in the average range on the memory test administered by Dr. Goff in October 2002; her medical records which did not support her allegation of cognitive impairment; her psychological evaluations and mental functional test results which have been "normal, average or described as only 'slight' or 'mild'"; Dr. Goff's diagnoses of an adjustment disorder and plaintiff's testimony that she takes medication for mood swings; plaintiff's absence of treatment by a mental health professional and that she has not sought mental health treatment; and her testimony that she has friends and gets along well with family

35

members. (Tr. 21).

The ALJ found plaintiff has mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate deficiencies of concentration, persistence and pace, but would never have episodes of deterioration or decompensation.  He also found she has no more than a moderate restriction "in all areas as to her ability to cope with the mental demands of the workplace" and "has the ability to remember simple instructions." (Tr. 21- 22).

The undersigned finds that the ALJ's decision that plaintiff's evidence did not satisfy the second prong of the pain standard is supported by substantial evidence and that the ALJ set forth adequate and specific reasons to support this determination.  Further, the undersigned also finds that the ALJ set forth adequate and specific reasons for finding plaintiff's allegations of pain and other subjective complaints were not fully credible.

In regard to her exertional and postural residual functional capacity, the evidence outlined by the ALJ in support of his decision does not indicate that plaintiff's underlying medical conditions were of such severity as to cause the chronic disabling pain and functional limitations alleged and the medical evidence does not document the severity of the symptoms.  Plaintiff relies primarily upon the MRI results showing traumatic calcification[19] of the right femur and degenerative disc disease in her cervical spine from Dr. Brockington's records and his statement that there was nothing that could be done for these problems. (Tr. 212).  He also diagnosed mild tendinosis in plaintiff's right shoulder. (Tr. 215).

---

[19]   Traumatic is defined as "of, relating to, resulting from, or causing a trauma"and  calcification is defined as "a process in which the mineral calcium builds up in tissue, causing it to harden. This can be a normal or abnormal process." Medical Encyclopedia, National Library of Medicine, National Institutes of Health.  http://www.nlm.nih.gov/medlineplus

However, despite these findings, he did not restrict plaintiff's activities or indicate any residual functional limitation in regard to her neck or hip, nor did he prescribe any pain medication [20] or recommend surgery. Instead, he recommended physical therapy. (Tr. 212).[21] Also, at plaintiff's October 2002 visit, Dr. Brockington did not discuss any medical findings related to plaintiff's neck or right hip but for his notation that plaintiff's gait was stable. Instead the examination and testing focused on carpal tunnel syndrome and findings of slightly reduced strength and grip of the lower arms. Dr. Brockington decided to conservatively treat plaintiff with splints and non-steroidal anti-inflammatory medication. (Tr. 402, 405).

At her next and last visit on March 27, 2003, Dr. Brockington noted she was taking Bextra for carpal tunnel syndrome which appeared stable. He noted there was "persisting mild weakness of the distal upper extremities bilaterally, somewhat worse on the right, with no evidence of progressive atrophy." (Tr. 401). Again, he determined that plaintiff could be conservatively managed so long as she did not become progressively weak or lose function. He did not report any complaint by plaintiff of pain in the hip or neck and noted that plaintiff returned for treatment of ongoing paresthesias and weakness. (Tr. 401).

Plaintiff argues that the records from Dr. Crompton also support the severity of her underlying impairment and symptoms. However, even though Dr. Crompton reported the nerve conduction test

---

[20]  In September, 2002, he advised plaintiff to continue taking Neurontin as needed for her pain. (Tr. 403).

[21]  On August 23, 2002, when plaintiff was involved in a second automobile accident, the radiologist noted "mild discogenic degenerative changes at C5-6 and C4-5" but no other abnormality. (Tr. 321).

results indicated neuropathy, he last saw plaintiff six weeks after her accident and at that time noted a

"mild antalgic gait" and that plaintiff was "definitely improving". (Tr. 197).

Plaintiff also argues that the ALJ erroneously relied upon her reports of her activities of

daily living to discredit the severity of her underlying impairments and her subjective complaints.

However, when making a credibility determination, the ALJ may consider plaintiff's daily activities.

Social Security Ruling 96-7p; Macia v. Bowen, 829 F. 2d 1009, 1012 (11th Cir. 1987); see also 20

C.F.R. § 404.1529(c)(3)(i); 416.929(c)(3)(i) ("Factors relevant to your symptoms, such as pain, which

we will consider include: (i) Your daily activities[.]").   Plaintiff's testimony regarding her daily activities

indicates that she needs some help with heavy house work and grocery shopping because of her right

side weakness but is otherwise independent.(Tr. 45-46).  Her testimony does not support her argument

that her impairments are so severe that they could reasonably give rise to the symptoms alleged or that

the objective evidence documents the severity of her impairments.  Additionally, the ALJ may also

consider other factors such as "the location, duration, frequency, and intensity of the individual's pain or

other symptoms" and "the type, dosage, effectiveness, and side effects of any medication the individual

takes or has taken to alleviate pain or other symptoms". Social Security Ruling 96-7p.  Although not

specifically referenced by the ALJ, plaintiff testified that she has pain, stiffness, and soreness in her right

hip, right ribs and right shoulder (Tr. 36-37) but takes no pain medication but for Neurontin for

headaches. (Tr. 47).  The medication list presented at the hearing did not include a pain medication but

for the Neurontin. (Tr. 135).  Additionally, at three subsequent hospitalizations  for falling from a porch,

getting kicked by a horse, and another automobile accident, plaintiff reported her pain as a level three.

(Tr. 386, 308, 271).

In regard to her allegations of cognitive impairment resulting from her closed head injury, the undersigned also finds that the ALJ's decision that plaintiff's complaints were less than fully creditable is supported by substantial evidence in the record. Plaintiff again relies upon the findings of Dr. Goff and Dr. Brockington. (Tr. 401, 229-243). However, as previously discussed, Dr. Goff found plaintiff had normal memory and average intelligence and Dr. Brockington's March 2003 opinion of plaintiff's limited cognitive functioning was not consistent with his prior treatment records. Plaintiff also argues that the ALJ improperly found that "her evaluations and test results have been "normal, average or described as only 'slight' or 'mild'" (Tr. 21). She points to Dr. Goff's findings in his medical source statement which indicates some areas of function which were moderately, markedly and extremely limited. (Tr. 234-236). However, even though Dr. Goff identified these areas of marked and extreme limitations of function, (Tr. 234-236), he indicated that overall plaintiff's cognitive deficits were moderate. (Tr. 233). This finding was adopted by the ALJ who found plaintiff would "have moderate or less restrictions in all areas as to her ability to cope with the mental demands of the workplace." (Tr. 22). Thus, the ALJ did not substitute his opinion for that of the treating and examining physicians and psychologists.

Additionally, Dr. Goff apparently relied upon plaintiff's report that she received a closed head injury at the time of her accident. However, the objective medical evidence does not clearly support her allegation. The CT scan taken at the time of the accident was normal and the subsequent MRI ordered by Dr. Brockington was normal. (Tr. 138, 152, 214, 216). She was not diagnosed with a closed head injury at the time of discharge from the hospital. Dr. Crompton counseled plaintiff in regard to her perception that she had a closed head injury. (Tr. 201). Importantly, after reading her

MRI report, Dr. Brockington noted his thoughts that plaintiff's "dizziness and slowed cognitive function and decreased attention are most likely due to her thyroid disease, and it may be a month or two before she begins to notice significant improvement in these regards. . . .  There is no gross evidence on MRI of any structural abnormalities which could possibly be provoking memory and attention decreases." (Tr. 214).  Therefore, the ALJ did not err by failing to find that Dr. Goff's assessment or Dr. Brockington's findings at his last examination demonstrate that plaintiff's alleged underlying impairment, a closed head injury, was of such severity as to reasonably cause the symptoms alleged.

**3.  Whether the ALJ erred by failing to formulate a hypothetical question to the vocational expert which included all of plaintiff's impairments.**

Plaintiff argues that the ALJ failed to formulate a complete hypothetical question because he did not include the conclusions of Dr. Goff's regarding plaintiff's ability to remember and concentrate as made in the medical source statement. (Tr. 234). Plaintiff states that when a hypothetical question based upon Dr. Goff's entire report was presented to the VE, the VE correctly responded that no jobs would be available.

"In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." Wilson v. Barnhart, 284 F. 3d 1219, 1227 (11th Cir. 2002) citing Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir.1999), cert. denied, 529 U.S. 1089, 120 S.Ct. 1723 (2000).  If a plaintiff has nonexertional impairments, then the ALJ may use the Medical-Vocational Guidelines as a framework for evaluation of plaintiff's vocational factors such as age, education, past work, but the ALJ must also introduce other evidence,

preferably the testimony of a VE regarding the existence of jobs in the national economy which plaintiff

can perform. See Wolfe v. Chater, 86 F.3d 1072, 1077-78 (11th Cir.1996). If the ALJ relies upon a

VE's response to a hypothetical question as substantial evidence to support a determination that plaintiff

can perform other work which exists in significant number in the national economy, then the elements of

the hypothetical question must comprehensively describe all of plaintiff's exertional and non-exertional

functional limitations. See Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir.1995); Welch v. Bowen, 854

F.2d 436, 440 (11th Cir. 1986); McSwain v. Bowen, 814 F. 2d 617, 619-620 (11th Cir. 1986);

Pendley v. Heckler, 767 F.2d 1561, 1562-1562 (11th Cir. 1985) (per curiam). Also, the elements of

the hypothetical question, i.e., the functional limitations, must be supported by substantial evidence.

Graham v. Bowen, 790 F.2d 1572, 1573 (11th Cir. 1986); see Allen v. Sullivan, 880 F.2d 1200, 1201

(11th Cir.1989); Cowart v. Schweiker, 662 F.2d 731, 736 (11th Cir.1981) ("Although there is no per

se rule that a vocational expert be called to testify ... the ALJ must articulate specific jobs that the

claimant is able to perform, and this finding must be supported by substantial evidence, not 'mere

intuition or conjecture by the administrative law judge.'").

     In regard to her mental functional abilities, the ALJ found plaintiff has "moderate or less

restrictions in all areas as to her ability to cope with the mental demands of the workplace." (Tr. 22).

The ALJ presented a hypothetical question including this element with plaintiff's vocational profile and

exertional and postural limitations. (Tr. 55-56). The VE responded that the person could not perform

any of her past relevant work but could perform the light, unskilled work such as ticket taker and order

clerk. (Tr. 56). When the ALJ presented the mental restrictions identified by Dr. Goff. The VE

responded that no work would be available for a person with marked to extreme impairments in the

41

ability to follow simple instructions or maintain appropriate attention and concentration as noted by Dr. Goff. (Tr. 56-57).

Dr. Goff found plaintiff had a marked impairment in regard to constriction of interests; the ability to understand, remember and carry out simple instructions and repetitive tasks; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; responding appropriately to changes in the work setting and customary work pressures. (Tr. 234-236).  He also found plaintiff was extremely limited in the ability to understand, remember and carry out complex instructions. (Tr. 235).  In regard to these limitations, the ALJ found that the

> restrictions placed on the claimant by Dr. Goff are not supported by the record as a whole, including claimant's activities of daily living and examinations (mental) by other practitioners of record.  Accordingly the undersigned accords little weight to the opinion of Dr. Goff concerning the level of the claimant's cognitive impairment and finds that claimant's cognitive disorder, if any, is no more than moderate in severity.

(Tr. 21).

The undersigned previously determined that the ALJ set forth adequate and specific reasons for rejecting Dr. Goff's mental restrictions as expressed in the medical source statement to the extent that they exceed a moderate impairment (see supra section one).  Therefore, without reiterating the medical evidence or the analysis, the undersigned finds that the ALJ did not commit error by failing to rely upon the response to the hypothetical question which contained these mental restrictions as elements.

**4.  Whether the ALJ erred by relying upon the opinion of an unacceptable medical source.**

Plaintiff argues that the ALJ erred by basing elements of his hypothetical question upon the findings of a physical therapist who is not an acceptable medical source as defined in 20 C.F.R. § 404.1513(a)-(d).  Plaintiff also argues that because the evidence was not created or submitted by an acceptable medical source it was not entitled to the weight accorded to evidence from an acceptable medical source such as Dr. Goff and Dr. Brockington.

The ALJ found plaintiff has the RFC to perform light exertional work limited by the following postural restrictions: no overhead work; no frequent pushing and pulling with her right arm, crouching, squatting or kneeling; a sit-stand option; no use of foot controls; bench type work if available; and "ambulating independently two to three miles per hour at a 5% grade for ten minutes and able to lift 25 pounds overhead." (Tr. 22).   In formulating the last part of the RFC, the ALJ relied upon the physical therapist's report found in Dr. Crompton's records. (Tr. 195).  The therapist reported to Dr. Crompton that plaintiff was ambulating independently, walking 2.3 miles per hour at a five per cent grade for ten minutes, and was able to lift twenty-five pounds overhead. (Tr. 195).  The other functional limitations identified in the RFC were not addressed in the therapist's assessment.

The Code of Federal Regulations identifies the sources "who can provide evidence to establish an impairment" and states that the Social Security Administration needs "evidence from acceptable medical sources to establish whether [a claimant has] a medically determinable impairment(s)." 20 C.F.R. § 404.1513(a).  The regulation identifies and explains the scope of five sources: (1) Licensed physicians; (2) Licensed or certified psychologists;(3) Licensed optometrists; (4) Licensed podiatrists; and (5) Qualified speech-language pathologists.  Id. However, the regulation also identifies "other sources" and explains that

43

> [i]n addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, [the Administration] may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include, but are not limited to– (1) Medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists)[.]

20 C.F.R. § 404.1513(d).  Thus, while physical therapists may not be an acceptable medical source, they are an acceptable other source upon which the ALJ may rely in reaching a decision.

Additionally, plaintiff also argues that the ALJ erred by relying upon the findings of the physical therapist instead of the acceptable medical sources, such as Dr. Goff and Dr. Brockington.  Plaintiff relies upon Johnson v. Apfel, Civ. A. No. 98-0674-AH-G, 2000 WL 208741 at *3 (S.D. Ala. 2000)[22] which cites Komar v. Apfel, 134 F. 3d 382 (10th Cir. 1998).  In Komar, the Tenth Circuit held as follows:

> While a physical therapist does not qualify as an "acceptable medical source" under the regulations, 20 C.F.R. §§ 404.1513(a), 416.913(a), physical therapists do qualify as "other sources," id. §§ 404.1513(e), 416.913(e). As such a physical therapist's opinion can be considered, but the opinion is entitled to less weight than that accorded to the opinions of acceptable medical sources. See Craig v. Chater, 76 F.3d 585, 590 (4th Cir.1996). Thus, the ALJ did not err in considering the physical therapist's opinion in conjunction with the opinions of acceptable medical sources. The record contains no indication that the ALJ relied solely on the physical therapist's opinion.

Id.  In the present case, the ALJ discussed and assessed Dr. Crompton's and Dr. Brockington's medical records in reaching his RFC determination. Thus, the ALJ considered the therapist's opinion in conjunction with the opinions of the acceptable medical sources and did not erroneously rely solely upon the therapist's opinion.

---

[22] Johnson addressed the issue of whether the ALJ gave proper credit to the opinion of a licensed professional counselor.  Id.

Additionally, in <u>Johnson</u>, the court held as follows:

> Even if [Dr. Rush's checklist questionnaire qualified as a mental status examination], it was not created or submitted by an acceptable medical source and therefore is not entitled to the weight given evidence from an acceptable medical source. <u>See</u> <u>Gomez v. Chater</u>, 74 F.3d 967, 970-71 (9th Cir.), cert. denied, 519 U.S. 881 (1996)(while a nurse practitioner working in conjunction with a physician may constitute an acceptable medical source, a nurse practitioner working on his or her own does not).

<u>Id.</u> at *3.  In this case, the physical therapist's final assessment as well as other therapy reports were included in the records of Dr. Crompton, the treating orthopedist who referred plaintiff to physical therapy.  The therapist was working in conjunction with the orthopedist to rehabilitate plaintiff after her accident.  Accordingly, the undersigned finds that the therapist's assessment was created or submitted by an acceptable medical source and the ALJ committed no reversible error in his evaluation of the assessment and inclusion of elements of the assessment in his RFC determination.

## VIII.   Conclusion

For the reasons set forth, and upon consideration of the administrative record, the memoranda of the parties, and oral argument, the decision of the Commissioner of Social Security denying plaintiff's claim for Social Security disability insurance benefits and supplemental security income be

**AFFIRMED.**

**DONE** this 6th day of May, 2005.

s / Kristi  D.  Lee
**KRISTI   D.   LEE**
**UNITED STATES MAGISTRATE JUDGE**
